## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

### EVGENY SPIRIDONOV

I, Jason Seltzer, being first duly sworn, depose and state as follows:

### AFFIANT'S BACKGROUND

1. I have been a Special Agent with the United States Department of Commerce ("DOC"), Office of Export Enforcement ("OEE") since 2012. I am currently assigned to the OEE Washington Field Office. I have conducted numerous investigations involving the illegal export of commodities, such as high technology items that have a commercial and military application. As a Special Agent with OEE, I have conducted or participated in tasks such as surveillance, the execution of search warrants, seizure of evidence, maintaining informants, the review of documents and recorded conversations as well as physical arrests. Prior to my employment with the DOC, I served as a federal law enforcement officer with the Department of Homeland Security beginning in 2009.

2. I am familiar with the facts and circumstances set forth below from my review of emails, documentation, and publicly available information, and my conversations with other law enforcement officers. Where the actions, statements, and conversations of others are recounted herein, they are recounted in substance and part, unless otherwise indicated. Where the affidavit contains items in quotation marks, those quotations are based on agent notes and may not be verbatim. Because this affidavit is being submitted for the limited purpose of supporting a criminal complaint, I am setting forth only those facts and circumstances necessary to establish probable cause for the issuance of the requested complaint.

### PURPOSE OF AFFIDAVIT

3. This affidavit is in support of a criminal complaint charging EVGENY VIKTOROVICH SPIRIDONOV ("SPIRIDONOV") with an attempt to unlawfully export U.S.-origin goods to Russia, that is, to export the goods without first having obtained the necessary export license, in violate of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705, and Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774.

## **EXPORT CONTROL LAWS AND REGULATIONS**

### IEEPA, EAR, AND THE SDN LIST

4. IEEPA authorizes the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States when the President declares a national emergency with respect to that threat.

5. IEEPA also empowers the U.S. Department of Commerce ("DOC") to issue regulations governing exports. Initially, the Export Administration Act ("EAA"), 50 App. U.S.C. §§ 2401-2420, regulated the export of goods, technology, and software from the United States. Pursuant to the provisions of the EAA, the DOC promulgated the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, which contain additional restrictions on the export of goods outside of the United States, consistent with the policies and provisions of the EAA. See 15 C.F.R. § 730.02. Although the EAA lapsed on August 17, 2001, pursuant to the authority provided to the President under IEEPA, the President issued Executive Order 13222. In that order, the President declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the expiration of the EAA. Accordingly, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA. Presidents have repeatedly signed renewals of the national emergency with respect to the EAA's expiration. The President issued the most recent "Continuation of the National Emergency with Respect to Export Control Regulations" on August 15, 2017. See 82 Fed. Reg. 39,005 (Aug. 16, 2017). Under IEEPA, it is a crime to willfully violate any regulation promulgated thereunder, including the EAR. See 50 U.S.C. § 1705.

6. Among other things, the EAR prohibits the export of certain goods and commodities to specific countries, absent permission from the DOC issued in the form of an export license. Specifically, the DOC has devised the "Commerce Control List" (CCL), see 15 C.F.R. § 774, which consists of general categories of goods that are controlled for export and are so designated by an "Export Control Classification Number" (an "ECCN"). The DOC also has devised the "Commerce Country Chart," see 15 C.F.R. § 738. In the event that a commodity or good is on the CCL, then an exporter must consult the Commerce Country Chart to determine whether an export license from the DOC is required to export the CCL item to a given country.

## **FACTUAL BASIS SUPPORTING PROBABLE CAUSE**

### Background

7. On or about January 9, a cooperating witness ("C-1") reported to law enforcement that C-1 had received an email from a Russian national who was interested in ordering various firearms-related equipment from C-1.

8. As of January 16, 2018, C-1 had entered a guilty plea, pursuant to a cooperation agreement, in the Middle District of Pennsylvania to one count of violation of 50 U.S.C. § 1705, attempting to export an item on the Commerce Control List without having first obtained the required license.. C-1 was pending sentencing at the time he provided this information to your affiant.

9. C-1 also provided law enforcement with copies of emails and text messages related to that order. Among those emails an was email dated December 15, 2017, from an email address ("Email 1") that displayed with SPIRIDONOV'S name. The email began, "Dear Mark! I come back to Vegas for the Shot show in January 2018. And again asking for your help in ordering some goods for me. Here they are." SPIRIDONOV's list of requests included a Nightforce "ATACR F1 Rifle Scope 34mm Tube 4-16x 42mm ZeroHold 1/10 # C573." The email concluded, "regards Evgeny."

10. Your affiant has reviewed a U.S. visa issued to SPIRIDONOV dated April 23, 2015 (expiration April 21, 2018) that lists Email 1 as SPIRIDONOV's email address.

11. Law enforcement reached out to the U.S. Department of Commerce, Bureau of Industry ("BIS") and Security, to determine whether the Nightforce riflescope mentioned by SPIRIDONOV in the December 15 email was subject to export controls under the EAR. On January 17, 2018, BIS issued a license determination that "Rifle Scope – Night Force ATACR 4-16X42") is controlled under ECCN 0A987.a. Specifically, the scope was controlled for export or re-export to Russia, and anyone wishing to export that type of riflescope to Russia is required to obtain a license from BIS.

12. On or about December 24, 2017, in a reply to an email chain including the email mentioned in Paragraph 9, above, SPIRIDONOV provided a credit card number in his name and expiration date to C-1.

13. On or about January 4, 2018, C-1 replied to the credit-card email and stated, "Evgeny I am working on getting your order together. With the shooting happened in Las Vegas this year I am nervous about sending your order to the hotel. I've heard that they are scanning package. Do you have any other place that I can send it to? I know that this stuff is going with you back to Russia and I don't care. I just don't want anything to come back on me from Las Vegas. My name and business are all over these items." SPIRIDONOV replied on or about January 10, 2018, "Please don't worry – no problems with the parcels in the hotel. There's no scanner – there special department, which is just keeps them to the moment, I'll take the package. No checks parcels the hotel."

14. On or about January 8, 2018, C-1 communicated with a WhatsApp account ending in -46-66 ("WhatsApp 1"). The phone number began with "+7," which your affiant knows to be the country code for Russia. C-1 informed your affiant that SPIRIDONOV communicates with C-1 using WhatsApp 1. Your affiant viewed this conversation in C-1's smart phone: In the conversation, the user of WhatsApp 1 and C-1 engaged in the following conversation:

> WhatsApp 1: "Good evening, [C-1's first name]. Any news on my order? Everything is OK?"
>
> C-1: "I having problems sir because items require license."
> WhatsApp 1: Understand you. Waiting for your final decision.
>
> C-1: Ok
>
> WhatsApp 1: Are you worried because of riflescope? This is not a problem – I'll take it without the box. And remove the serial number.
>
> WhatsApp 1: If you ask me where I got it – I will say that he bought it at the pawn shop.
>
> WhatsApp 1: How do you like my idea? I think it is safe for you.

15. Law enforcement agents have viewed social-media pages linked to Email 1. That social-media research led agents to a public Facebook page that appears to belong to SPIRIDONOV and includes multiple images of an individual whose appearance is similar to the photograph on SPIRIDONOV's U.S. visa application. The Facebook page also includes many links to the "Kalashnikov Concern," a Russian company that produces a number of military weapons, including multiple grades and versions of assault rifles, grenade launchers, sniper rifles, military shotguns, and aircraft cannons. Your affiant has also viewed a photograph from that Facebook page of an individual appearing to be SPIRIDONOV that lists his name, as well as the title "Director of Special Projects, Kalashnikov Group."

16. Your affiant is aware that on or about March 24, 2014, the President signed an executive order, pursuant to IEEPA, finding that the actions and policies of the Government of the Russian Federation constitute an unusual and extraordinary threat to the national security and foreign policy of the United States. Your affiant is aware that, pursuant to that order, the Kalashnikov Concern was designated as a "Specially Designated National" (SDN) by the Office of Foreign Assets Control ("OFAC"), a division of the United States Treasury, on or about July 16, 2014. On or about December 22, 2015, OFAC issued additional sanctions targeted at, *inter alia*, the Kalashnikov Concern, which has, per OFAC, "engaged in serious and sustained sanctions evasion."

17. On or about January 23, 2018, Homeland Security Investigations agents purchased a Rifle Scope – Night Force ATACR 4-16X42. They transported it to Las Vegas, NV and placed it in a

4

box addressed to SPIRIDONOV at his hotel room, along with other items he had requested from C-1. SPIRIDONOV had previously requested C-1 send the items he requested to his hotel in Las Vegas. Agents delivered it to the hotel where SPIRIDONOV was staying.

18. At approximately 7:00 a.m. Pacific Standard Time on January 27, 2018, agents witnessed the hotel concierge call SPIRIDONOV and inform him he had a package. Approximately five minutes later, agents witnessed him come to the front desk and pick up the package described in Paragraph 17, above. Agents followed him back to his hotel room, and he entered that room with the package.

19. At approximately 7:45 a.m., SPIRIDONOV and a companion left SPIRIDONOV's hotel room and ate breakfast. The agents conducting surveillance noted that neither had any items in his possession. At approximately 8:45 a.m., they went back to SPIRIDONOV's hotel room.

20. At approximately 9:00 a.m., SPIRIDONOV and his companion left his hotel room. Each had a suitcase and a backpack. Agents followed them to the lobby and witnessed them get into a taxi with the suitcases and backpacks.

21. Agents followed that taxi to McCarron Airport in Las Vegas, never losing sight of it. The agents saw SPIRIDONOV and his companion exit the taxi, enter the airport, check in at a Delta Airlines kiosk, and check their bags. Their suitcases were checked to Los Angeles International Airport ("LAX"), and they kept their backpacks on their person. Agents followed the pair to the TSA checkpoint and saw them get into the checkpoint and never leave to reenter the unsecured area of the terminal.

22. Two law enforcement agents were booked on SPIRIDONOV's flight from McCarron to LAX and saw him leave the TSA checkpoint an enter the the secured area. They followed SPIRIDONOV and his companion to the gate of a Delta Airlines flight from Las Vegas to LAX. Agents boarded the flight with SPIRIDONOV. One agent was stationed outside the gate to see either left the plane before it left; neither exited the plane.

23. SPIRIDONOV remained under surveillance throughout the flight to LAX. Upon disembarking, agents witnessed him go to the baggage carousel and retrieve his suitcase, which appeared to be the same suitcase he had checked in Las Vegas. Agents then witnessed him to go the Aeroflot counter and check his bag at the counter.

24. Customs and Border Protection ("CBP") has confirmed that the bag SPIRIDONOV checked was checked through to Moscow, Russia. CBP has also confirmed that the bag contained the aforementioned riflescope, as well as the other items that were delivered to his hotel in Las Vegas this morning.

25. Agents conducted further surveillance; they followed SPIRIDONOV from the counter through the TSA checkpoint, and those agents confirmed that SPIRIDONOV cleared security and entered the international terminal at LAX.

## FAILURE TO OBTAIN A LICENSE

26. At no time did C-1 or SPIRIDONOV obtain a license from OFAC or BIS, both of which are located in the District of Columbia, to export any of the U.S.-origin goods set forth above from the United States to Russia.

## CONCLUSION

Based on the abovementioned facts, I submit there is probable cause to believe that SPRIDONOV attempted to export controlled US technology (that is the Rifle Scope – Night Force ATACR 4-16X42) to Russia without a license, in violation of 50 USC §1705; and the EAR, 15 C.F.R. §§ 730-774

_____
Jason Seltzer, Special Agent
Department of Commerce

Subscribed and sworn before me this 27th day of January, 2018.

_____
Hon. Deborah A. Robinson
United States Magistrate Judge